# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

CHRISTIN MARIE STORM                      CASE NO. 3:18-CV-00191

VERSUS                                    JUDGE TERRY A. DOUGHTY

ANDREW SAUL, COMMISSIONER,                MAG. JUDGE KAREN L. HAYES
SOCIAL SECURITY ADMINISTRATION

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice**.**

### Background & Procedural History

Christin Marie Storm filed the instant applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income payments on July 9, 2015. (Tr. 12, 168-182).[1] She alleged disability as of January 1, 2015, because of lupus SLE, kidney disease/failure, reactive airway disease, depression, anxiety, chronic joint pain, chronic muscle pain, joint swelling, insomnia, and extreme fatigue. (Tr. 204, 208). The state agency denied the claims at the initial stage of the administrative process. (Tr. 65-92). Thereafter, Storm requested and received a December 15, 2016, hearing before an Administrative Law Judge ("ALJ"). (Tr. 27-63). However, in a February 1, 2017, written decision, the ALJ determined that Storm was not disabled under the Social Security Act,

---

[1] Storm filed a prior application that was denied initially on November 5, 2013, and apparently not further appealed. *See* Tr. 204-205.

finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in substantial numbers in the national economy. (Tr. 9-22). Storm sought review of the adverse decision before the Appeals Council. On December 19, 2017, however, the Appeals Council denied the request for review; thus the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On February 15, 2018, Storm filed the instant complaint for judicial review of the Commissioner's decision. She asserts the following errors:

1)      The Commissioner's decision applied an incorrect legal standard by relying on determinations by the ALJ which gave more weight to the opinions of non-examining DDS reviewing sources than to those of the consultative examiners and of the treating sources.

2)      The Commissioner's findings are the product of "cherry-picking" by the Administrative Law Judge on issues of disability, ignoring portions of the record which are consistent with Ms. Storm's testimony and medically determinable impairments, thus fairly detracting from the substantiality of evidence supporting the Commissioner's findings, so that the Commissioner's decision is not supported by substantial evidence.

3)      The Commissioner's findings are also the product of misstatement and mischaracterization by the ALJ of the evidence so that the decision to deny benefits is not supported by substantial evidence.

The matter is fully briefed and ripe.

## **Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*,

798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the

Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

3

(1)    An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)    An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3)    An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)    If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)    If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*,  239 F.3d 698, 704 -705 (5th Cir. 2001);  20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## ALJ's Findings

### I.    Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant had not engaged in substantial gainful activity during the relevant period.  (Tr. 14-15).[1]  At step two, she found that the claimant suffers severe impairments of lupus with lupus nephritis, fibromyalgia, and

---

[1] Albeit, she worked as a babysitter on a part-time basis.

obesity. (Tr. 15-16).[2]  She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 17).

## II.     Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform the full range of light work. (Tr. 17-21).[3]

## III.    Steps Four and Five

At step four, the ALJ determined that the claimant had no past relevant work. (Tr. 21). Accordingly, she proceeded to step five. At this step, the ALJ determined that the claimant was a younger individual, with at least a high school education, and the ability to communicate in English. (Tr. 21).  Transferability of skills was not at issue because the claimant had no past relevant work. *Id*.

The ALJ then observed that, given the claimant's vocational factors, and the ability to perform the full range of light work, the Medical-Vocational Guidelines directed a finding of not

---

[2] The ALJ further found that the claimant's medically determinable impairments of depression and anxiety were not severe. *Id.*

[3] Light work entails:

> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

disabled.  20 C.F.R. § 404.1569; Rule 202.20, Table 2, Appendix 2, Subpart P, Regulations No. 4. (Tr. 21-22).

### Non-Exhaustive Chronology of Relevant Medical Evidence

On July 19, 2013, Storm was seen by nurse practitioner, Erika Spencer.  (Tr. 321-323). Storm wanted her kidneys checked, and medication refills.  *Id.*

On August 14, 2013, Storm was seen at University Health-Shreveport by Seth Berney, M.D. (Tr. 325-327).  She reported no weight loss or gain.  *Id.*  She experienced joint stiffness for two hours.  *Id.*  She had a trichophyton on her right arm.  *Id.*  She was not photosensitive to the sun.  *Id.* She had achy muscle pain, headaches, and occasional confusion.  *Id.*  Upon examination, she had multiple tattoos, but no rashes.  *Id.*  Berney suspected that plaintiff had SLE, and was awaiting biopsy results from Arkansas Children's Hospital.  *Id.*  He was concerned that she had OSA, given her symptoms, snoring, and size.  *Id.*

On October 7, 2013, Storm was seen by David Williams, Ph.D., for a psychiatric and diagnostic evaluation at the request of the state agency for purposes of her 2013 disability application.  (Tr. 273-280).  Storm's chief complaints were lupus and kidney disease, secondary to lupus.  *Id.*  She was diagnosed with lupus in 2006.  *Id.*  Stress increased her symptoms and she recently had started a new job.  *Id.*  In 2008, she experienced symptoms of depression following the death of her fiancée.  *Id.*  She denied current symptoms of depression.  *Id.*  She reported having some close friends.  *Id.*  Storm had experienced symptoms of daily anxiety with onset at the age of 15.  *Id.* She recounted experiencing panic attacks every two to three months.  *Id.*  She smoked marijuana daily, but last used a few months earlier.  *Id.*

Williams diagnosed anxiety disorder and assigned a Global Assessment of Functioning ("GAF") score of 61, which indicated mild symptoms. *Id.*[2] Storm's understanding remained intact. *Id.* Her concentration, pace, and persistence were adequate. *Id.* She was able to manage her own finances. *Id.*

On November 20, 2013, Storm returned to Dr. Berney at University Health-Shreveport. (Tr. 327-330). She had joint stiffness for 30 minutes, and slight nausea, without vomiting from stress about her job. *Id.* She had lower back and neck pain. *Id.* She reported that she used illicit drugs, and had multiple tattoos, without rashes. *Id.*

On February 19, 2014, Storm was seen by Dr. Berney, who was concerned that she had OSA, but her PCP refused to refer her for a sleep study. (Tr. 330-333). Accordingly, Dr. Berney referred her himself. *Id.* Storm's pelvic pain had resolved. *Id.*

On March 12, 2014, Storm was seen by nurse practitioner, Carrie Genusa, for rash, easy bruising, cough, and medication refills. (Tr. 318-320). Storm believed that her rash and bruising were caused by her lupus. *Id.* She complained of myalgia muscle aches all over her body. *Id.* Upon examination, Storm had a very mild spotty rash that was resolving. *Id.*

On April 1, 2014, Storm returned to Genusa for cough, shortness of breath, congestion, and diarrhea. (Tr. 315-317).

---

[2] **Error! Main Document Only.**"GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd*, 239 F.3d at 701 n.2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)).
   A GAF of 61-70 denotes "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** DSM-IV, pg. 32.

Storm next was seen by Dr. Berney on May 14, 2014.  (Tr. 333-336).  She reported total body pain, especially her shoulders, knees, and ankles.  *Id.*  She had nausea with vomiting the night before, which she attributed to anxiety.  *Id.*  Berney still suspected SLE.  *Id.*  He again referred her for a sleep study.  *Id.*

On June 19, 2014, Storm was examined by Sarah Khan, M.D.  (Tr. 336-339).  Storm reported no fatigue, malaise, or weight change.  *Id.*  She had no current joint swelling or arthralgias.  *Id.*

On June 23, 2014, Storm was seen by Joshua Holstead, M.D., for renal biopsy.  (Tr. 339-341).  Holstead diagnosed lupus nephritis.  *Id.*

On July 8, 2014, Storm was seen by Chyi Chyi Chong, M.D.  (Tr. 341-344).  Storm complained of generalized fatigue and back pain.  *Id.*

On July 24, 2014, Dr. Berney again saw Storm.  (Tr. 344-345).  Storm reported that she had been smoking about ½ pack of cigarettes per day.  *Id.*  She also used illicit drugs -- marijuana.  *Id.*  Berney diagnosed SLE, and prescribed CellCept.  *Id.*

Storm returned to Dr. Berney on August 27, 2014, and reported that she had stopped smoking around six to eight months earlier.  (Tr. 345-348).  She also had nausea and vomiting about three days earlier.  *Id.*  She had no rashes.  *Id.*  She appeared to be tolerating the CellCept well.  *Id.*  Berney did not know why she had back pain or abdominal pain.  *Id.*  He still was concerned that she had OSA.  *Id.*

On November 5, 2014, Storm was examined by Kristen Erickstad, M.D.  (Tr. 348-351).  Storm complained of pain in both of her thumbs and morning stiffness that lasted 2.5 hours.  *Id.*  She had myalgias in all extremities.  *Id.*  She experienced redness on her cheeks and chest when she went out in the sun.  *Id.*  She had episodes of dizziness associated with tunnel vision and headaches.  *Id.*  She vomited about four days per week, but denied any weight loss.  *Id.*  She had episodes of chest pain and shortness of breath associated with panic attacks.  *Id.*  Storm also had a non-persistent,

8

photosensitive rash. *Id.* She did not experience confusion. *Id.* Erickstad diagnosed SLE, with no evidence of a flareup. *Id.* Although Storm had multiple complaints, they appeared unrelated to her SLE. *Id.*

On December 15, 2014, Storm was seen by Carrie Genusa to refill her medication for insomnia, anxiety, and lupus. (Tr. 312-314).

On February 9, 2015, Storm returned to nurse practitioner, Carrie Genusa. (Tr. 309-311). She complained of body aches, fatigue, headaches, shortness of breath, chest pain. *Id.* She reported extreme fatigue and falling asleep in random places. *Id.* Her symptoms were present for three to four days. *Id.* She reported throwing up every day for three days. *Id.* She complained of myalgia with extreme diffuse body aches all over. *Id.* She had no rash, but had joint stiffness, joint pain, and joint swelling. *Id.*

Storm was seen by Dr. McCormick on March 2, 2015. (Tr. 308). She wanted a referral to Dr. Robicheaux. *Id.* McCormick diagnosed dysmenorrhea and lupus. *Id.* He gave Storm a referral to Rochelle Robicheaux for lupus. *Id.*

Carrie Genusa examined Storm on March 26, 2015. (Tr. 305-307). At that time, Storm complained about her immune system shutting down, inability to sleep, coughing, diarrhea, vomiting, and headaches. *Id.* Plaintiff stated that her body was shutting down because she could not sleep. *Id.* She believed that her lupus was acting up. *Id.* She complained of low energy all day and anxiety. *Id.* She also reported diarrhea that had started two or three days earlier. *Id.* She denied a rash, but had dizziness and shortness of breath. *Id.* Storm experienced joint stiffness, joint pain, and joint swelling. *Id.* She also had urinary frequency and incontinence. *Id.*

On April 8, 2015, Storm returned to Carrie Genusa. (Tr. 302-304). Storm's chief complaints were stomach ulcer, cough, and lupus symptoms. *Id.* She was concerned that she might have fibromyalgia. *Id.* She stated that at the end of the day, she was so tired that she could not lift her

arms or do any housework. *Id.* She requested a note for work that described her limitations. *Id.* She had no joint stiffness, pain, or swelling. *Id.* She denied depression and anxiety. *Id.* She had no urinary frequency or incontinence. *Id.*

Storm returned to nurse practitioner Carrie Genusa on April 23, 2015, so she could have Genusa complete a form stating that she would need to miss work periodically because of her lupus. (Tr. 298-300). Storm complained of chest pain, shortness of breath, dizziness, edema, and tingling/numbness. *Id.* She denied urinary frequency and retention. *Id.* She complained of off and on headaches and dizziness. *Id.* She had generalized fatigue. *Id.*

Genusa acceded to Storm's request, and completed an employer-generated form on April 23, 2015, indicating that Storm would experience episodic and unpredictable flareups of lupus of two days' duration that would cause her to miss work approximately once per month. (Tr. 465-466). However, Genusa further indicated that Storm did not need to work part-time or on a reduced schedule because of the medical condition. *Id.*

On May 18, 2015, Storm was seen by Dr. McCormick to refill her Norco medication. (Tr. 296-297).

On May 27, 2015, Storm returned to McCormick to refill her Ambien, Xanax, and Phenergan. (Tr. 293-295). She denied joint stiffness, joint pain, joint swelling, rash, and dizziness. *Id.* On examination, her motor strength and sensory were normal. *Id.* McCormick diagnosed lupus and anxiety disorder. *Id.* He also recommended counseling. *Id.*

On June 15, 2015, McCormick refilled plaintiff's Norco medication. (Tr. 292).

Storm returned to Dr. Erickstad on July 2, 2015. (Tr. 351-354). She continued to experience almost daily vomiting, 4-5 times per day. *Id.* However, she had not lost any weight, despite ongoing vomiting for the past seven to eight months. *Id.* Storm also had joint and muscle pain, but no photosensitive rash. *Id.*

On July 9, 2015, Storm was seen by nurse practitioner Lana Heath for complaints of coughing for the last eight months.  (Tr. 290-291).

On July 15, 2015, Storm returned to Dr. McCormick to refill her Norco prescription and because of complaints of mild to moderate dizziness.  (Tr. 289).

At the request of the state agency, Storm underwent a consultative psychological evaluation on August 19, 2015, before licensed professional counselor ("LPC") Lyla Corkern,  (Tr. 378-383). Storm stated that she was suffering from lupus and kidney disease/failure.  *Id.*  She reported that this was her second application for disability benefits, and that she was applying because she had been unable to keep a job.  *Id.*  When asked why she could not work, Storm replied that she woke up nauseous and vomited daily.  *Id.*  She was unreliable because of medical complications, doctors' appointments, and was unable to commit to a regular schedule.  *Id.*  She reported fatigue, nausea, vomiting, and chronic pain.  *Id.*  *She identified minimally with additional mental health issues*.  *Id.* She called several places about obtaining counseling services, but was unable to attain assistance.  *Id.* Storm reported that she was living alone, and became anxious around too many people.  *Id.*  She managed grooming and hygiene, but kept it to a minimum.  *Id.*  She had friends, and typically was easy to get along with.  *Id.*  However, she did not initiate social contact unless needed.  *Id.* Nonetheless, she participated in group activities and generally was cooperative.  *Id.*  She stated that she could not complete work tasks because she could not keep up with the schedule.  *Id.*  She needed redirection and repetition.  *Id.*  She was moderately distractible and sometimes blanked out.  *Id.* Upon examination, however, Storm was able to follow multi-step directions, recall three words after 20 minutes, and was well-oriented.  *Id.*

Corkern believed that Storm's prognosis was fair.  *Id.*  Her mental health symptoms appeared to minimally impact her ability to understand, remember, concentrate, persist, socialize, keep pace, and/or to adapt.  *Id.*  It appeared that she could adequately sustain performance of simple tasks for

11

two hours periods over the work days and weeks, but the unpredictability of symptoms exacerbation would make attendance and/or performance impossible. *Id.*

On September 23, 2015, Storm was seen by Romana Shehzadi, M.D. (Tr. 384-389). Storm underwent an EGD, which showed mild gastritis and duodenitis. *Id.* A biopsy was unremarkable. *Id.*

On October 6, 2015, Storm returned to Dr. Erickstad. (Tr. 389-393). Reflux and vomiting persisted. *Id.* She also had joint pain all over and swelling in the morning. *Id.* Joint stiffness lasted one to two hours per day. *Id.* She had fatigue, and diffuse muscle pain. *Id.* She reported a butterfly rash, but had it covered with makeup. *Id.* Storm also did not exhibit a photosensitive rash. *Id.* Moreover, upon examination, Erickstad saw no evidence of butterfly rash. *Id.* Erickstad opined that her SLE appeared to be very stable, and most of her ongoing issues appeared to stem from other problems. *Id.*

Storm returned to Dr. Erickstad on January 5, 2016. (Tr. 393-397). She reported chronic vomiting since she was in high school. *Id.* She underwent a HIDA scan on November 20, 2015, that was unremarkable. *Id.* Storm did not go to a psychiatrist or attend physical therapy because they were cost prohibitive. *Id.* She experienced pain in all of her joints. *Id.* However, it had been worse in her arms lately. *Id.* She admitted that she took pills from her brother and her father because her Norco was not enough. *Id.* Storm still was having problems from vomiting every other day. *Id.* She reported no confusion. *Id.* Erickstad noted chronic diffuse musculoskeletal pain that was likely due to fibromyalgia. *Id.* Erickstad opined that she would benefit from physical therapy, but Storm said it was too expensive. *Id.*

Storm next saw Dr. Erickstad on April 5, 2016. (Tr. 401-405). She stated that her Cymbalta has not been helping her fibromyalgia. *Id.* Also, her legs had been hurting in the bones, making it difficult for her to walk. *Id.* She often could not sleep because of the pain. *Id.* She also had

12

shortness of breath constantly. *Id.* She still was vomiting on an almost daily basis. *Id.* Storm stated that her PCP might be stopping her Norco prescription because her drug screen had been positive for methamphetamines and marijuana. *Id.* Storm explained that she used marijuana frequently for pain, but was worried that her other medication might have caused her to test positive for methamphetamines. *Id.* She said that she had never used "meth." *Id.* Although Storm reported a butterfly rash, Erickstad again could not see any evidence of it. *Id.*

On July 6, 2016, Storm was seen by Sunny Patel, M.D. (Tr. 434-439). Storm reported that she was taking 1000 mg of CellCept per day instead of the prescribed twice per day. *Id*. She explained that this was "what her body needs." *Id.* She had worsened proteinuria, and therefore, nephrology recommended 24 hour urine collection, but Storm had missed it. *Id.* She was waiting to see a pain management physician. *Id.* She reported joint stiffness for one hour. *Id.* She denied nausea/vomiting. *Id.* She denied skin rash or photosensitive rash. *Id.* She also denied confusion. *Id.* Storm was not willing to increase her CellCept and refused plaquenil and prednisone. *Id.*

On August 16, 2016, Storm was seen by Vittal Chundru, M.D. (Tr. 453-455). She had no malaise or fatigue. *Id.* She also was negative for headaches, nausea, vomiting, and diarrhea. *Id.*

## Analysis

I.    **Step Two/RFC**

Initially, plaintiff contends that the ALJ erred because she discounted the opinions of the only mental health professionals (Dr. Tramontana and LPC Corkern) who assessed the effects of her mental impairments during the relevant period, and because she failed to discuss at all the findings of Dr. Williams, who evaluated plaintiff for purposes of her prior application. In her decision, the ALJ determined that plaintiff's depression and anxiety were non-severe impairments at step two of the sequential analysis. Accordingly, the court will begin its analysis at that step.

13

In assessing the severity of an impairment, the Fifth Circuit has determined that "an impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000) (citing *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir.1985)).  Furthermore, when evaluating the severity of mental impairments, the regulations require that a psychiatric review technique form be completed during the initial and reconsideration phases of the administrative review process.  20 C.F.R. § 1520a(e).  The psychiatric review technique rates the degree of functional limitation in four broad areas:  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 1520a(c).

However, when, as here, the ALJ's analysis proceeds beyond step two of the sequential evaluation process, strict adherence to *Stone* and its requirements is not required.  *See Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988); *Chapparo v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987); *Jones v. Bowen*, 829 F.2d 524, n. 1 (5th Cir. 1987).  Rather, under these circumstances, the effect of the ALJ's step two determination is measured by whether her step three finding and RFC are supported by substantial evidence.  This is so because once at least one severe impairment is determined to exist, all medically determinable impairments must be considered in the remaining steps of the sequential analysis.  *See* 20 C.F.R. §§ 404.1545, 416.945.

The ALJ resolved the opinion evidence, as follows:

> Dr. Joseph Tramontana, Ph.D., Disability Determination Services opined the claimant's mental impairment was severe with "B" criteria demonstrating moderate limitations in concentration, persistence, and pace.  Little weight is given this opinion, as treatment records do not corroborate these findings . . .

> Less weight is also given the opinion of the consultative examiner, Lyla Corkern, LPC, who opined that while the claimant could perform simple tasks for a two-hour period, the unpredictability of symptom exacerbation would make attendance and performance impossible.  This assessment rests largely on the claimant's

reports of her medical issues.  The clinical observations of the exam revealed all
functions were adequate or unimpaired.  This opinion is not consistent [with] the
overall evidence . . .

(Tr. 16).

The Fifth Circuit has recognized that an "ALJ is free to reject the opinion of any physician
when the evidence supports a contrary conclusion."  *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th
Cir.1987) (citation omitted).  Thus, "when good cause is shown, less weight, little weight, or even no
weight may be given to the physician's testimony.  The good cause exceptions [the court has]
recognized include disregarding statements that are brief and conclusory, not supported by medically
acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence."
*Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir.1994) (citation omitted).  Furthermore, the lack of
corroborative evidence in the treatment records is a valid reason for discounting a physician's
opinion.  *See Ward v. Barnhart*, 192 Fed. Appx. 305, 308 (5th Cir. 2006); *see also Nugent v. Astrue*,
278 Fed. Appx. 423 (5th Cir. 2008) (ALJ entitled to discount treating physician's conclusory
statement because it contradicted earlier treatment notes, objective medical findings, and other
examining physicians' opinions); *Richard ex rel. Z.N.F. v. Astrue*, 480 Fed. Appx. 773 (5th Cir.
2012) (ALJ may discredit physician's opinion by pointing to contrary evidence, albeit however
tersely); *Garth v. Astrue*, 393 F. App'x 196, 199 (5th Cir. 2010) (court noted that ALJ *could have*
discounted treating physician's opinion because the opinion contradicted his own treatment notes and
the claimant's admissions); *Vansa v. Astrue*, 423 F. App'x 381, 383 (5th Cir. 2011) (upholding ALJ's
decision to discount treating physician's opinion because, as the ALJ explained, it was "not
supported by the objective findings of his own clinic notes nor by the evidence as a whole.").

Dr. Tramontana did not examine plaintiff.  Therefore, his assessment was dependent upon the
examination findings of LPC Corkern.  As it turns out, however, Corkern opined that Storm's mental
health symptoms only *minimally* impacted her work functions.  (Tr. 382).  She then proceeded to

15

emphasize plaintiff's *physical* health issues before limiting plaintiff to performing simple tasks for two hour periods, and noting that the unpredictability of symptom exacerbation would make attendance impossible.  (Tr. 382).  These limitations are inconsistent with the "minimal" impact that Corkern attributed to plaintiff's mental impairments, and thus, appear to stem from plaintiff's physical impairments.  Needless to say, a licensed professional counselor is not qualified to render an opinion regarding the effects of physical impairments.

Plaintiff also faults the ALJ for failing to consider Dr. Williams' report from 2013.  The ALJ likely omitted the report from her decision because it was issued for purposes of plaintiff's prior application, and thus, arguably did not pertain to the relevant period.  Even so, LPC Corkern considered Williams' report in her evaluation.  Moreover, Dr. Williams' findings actually support the ALJ's assessment of the effects of plaintiff's mental impairments.  He issued relatively benign findings, and assigned a GAF consistent with mild symptoms.

In short, the court finds that the ALJ's decision to discount the opinions of Dr. Tramontana and LPC Corkern is supported by good cause.  Furthermore, her determination that plaintiff's mental impairments effectively did not reduce her capacity for work likewise is supported by substantial evidence.

## II.    Step Three

Couched within her argument regarding "cherry picking," plaintiff essentially asserted that the ALJ erred by failing to find that her impairments met or equaled a listing at step three of the sequential evaluation process.

To establish that a claimant's injuries meet or medically equal a listing, the claimant must provide medical findings that support all of the criteria for a listed impairment (or most similarly listed impairment).  *See Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).  In determining whether a claimant's impairment(s) equals a listing, all evidence in the case record about the

16

claimant's impairments and their effects are considered.  20 C.F.R.  § 404.1526(c).  An impairment

that manifests only some of the requisite criteria, no matter how severely, does not qualify.  *Sullivan*

*v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990).  If the plaintiff fails to demonstrate the

specified medical criteria, the court will find that substantial evidence supports the ALJ's finding that

listings-level impairments are not present.  *Selders*, 914 F.2d at 620.

     Plaintiff contends that her impairments meet the listing for lupus, a/k/a Systemic Lupus

Erythematosus ("SLE").  The relevant section provides:

> 14.02 Systemic lupus erythematosus. As described in 14.00D1. With:
>
> A. Involvement of two or more organs/body systems, with:
>
> > 1. One of the organs/body systems involved to at least a moderate level of severity; and
> >
> > 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).
> >
> > or
>
> B. Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
> > 1. Limitation of activities of daily living.
> >
> > 2. Limitation in maintaining social functioning.
> >
> > 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

Listing 14.02, 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (2016).

     In this case, the ALJ stated that she considered counsel's argument that his client's

impairment(s) met listing 14.02.  (Tr. 17).  However, she rejected the argument on the grounds that

there was no evidence of any adverse effect on any other body system, aside from her kidney.  *Id*.  In

addition, although there were some complaints of fatigue, there was no evidence of malaise, fever, or

involuntary weight loss, as required to meet listing 14.02(A).  *Id*.

On appeal, plaintiff does not contend that she suffers marked limitations of functioning, and therefore, necessarily does not argue that she meets the B criteria for listing 14.02.  Rather, she focuses her argument on the paragraph A criteria of 14.02.

At the outset, the court observes that the ALJ determined that plaintiff suffers from the medically determinable impairment of lupus, which she found to be a severe impairment. The major organ or body systems contemplated by the listing include:

> Respiratory  (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), Hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuation cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis).

Listing 14.00(D)(1), 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (2016).

Upon review, the undersigned finds that the record substantially supports the ALJ's finding that, in addition to her kidney issue, plaintiff did not suffer involvement of a second enumerated organ or body system as required to find that her SLE was of listing level severity.  While plaintiff complained of brain fog, her treatment records are replete with instances where confusion was not noted. Furthermore, plaintiff's anxiety had no more than a minimal impact on her functioning.  *See* discussion, *supra*.  Although plaintiff periodically complained of shortness of breath or dyspnea, there is no indication that she was ever diagnosed with pleuritis or pneumonitis.  Further, despite allegations of almost daily vomiting, she did not have any associated weight loss, and repeated workup failed to uncover any diagnosis for the condition.  In addition, although, at times, plaintiff complained of photosensitivity, this was not a consistent complaint, and Dr. Erickstad appeared to question whether plaintiff had a butterfly (or malar) rash at all.

Because the record substantially supports the ALJ's determination that plaintiff's SLE did not involve least *two* organs/body systems, the court finds that her overall step three determination is supported by substantial evidence.[3]

## III.   Physical RFC

The ALJ plainly ground her physical RFC finding on the opinion of the non-examining agency physician, Hollis Rogers, M.D., who reviewed the record and opined that Storm retained the residual functional capacity consistent with the full range of light work. (Tr. 21, 71-72). No examining or treating physician issued any limitations of functioning inconsistent with the foregoing. Although nurse practitioner, C. Genusa, estimated that plaintiff would experience one flareup per month that caused her to miss two days of work, she conceded that she was unable to predict when the lupus would flare. (Tr. 466). In discounting Genusa's estimate, the ALJ remarked that the specialists at University Health -- Shreveport who had seen and treated plaintiff on numerous occasions had documented the absence of lupus flares. (Tr. 21).

Furthermore, at the time of the ALJ's decision, a nurse practitioner, such as Genusa, was not considered an "acceptable" medical source under the regulations. *See* SSR 06-03p; 20 C.F.R. § 404.1513(d) & 416.913(d) (2016).[4] Moreover, only "acceptable medical sources" can provide "medical opinions" to show the severity of a claimant's impairment and how it affects her functional ability. 20 C.F.R. § 1527(a)(2) & 416.927(a)(2). Although the Commissioner was required to

---

[3] Having so held, the court need not address whether plaintiff also had two of the constitutional symptoms or signs, i.e., malaise, in addition to fatigue. However, plaintiff identified a significant number of ailments, discomforts, and illnesses that would appear to have contributed to a significantly reduced physical activity. Indeed, the ALJ reduced plaintiff' RFC to light work to compensate for the cumulative effect of her impairments.

[4] The regulations were reformulated in March 2017, and SSR 06-03p was rescinded. *See Young v. Berryhill*, 689 Fed. Appx. 819, 821 n.3 (5th Cir.2017)

consider evidence from "other sources" when evaluating an "acceptable medical source's" opinion, "the fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because, . . . 'acceptable medical sources' 'are the most qualified health care professionals.'" SSR 06-03p.[5] The ALJ effectively did that here.

Plaintiff also accused the ALJ of "cherry-picking," which she defined, in part, as "improperly crediting evidence that supports findings while ignoring evidence from the *same* source . . ." (Pl. Brief, pg. 5) (emphasis added). Plaintiff then pointed out that the ALJ simply went through the record and documented instances where plaintiff was doing well. *Id.* However, the court does not discern instances where the ALJ adopted relatively benign portions of a particular source's findings, while ignoring other sections of that *same* source's opinion that were inconsistent with the ALJ's findings.

Moreover, it remains within the province of the ALJ to weigh the record evidence. While an ALJ certainly is obliged to consider all of the record evidence,[6] she need not discuss every piece of evidence in the record. *Bordelon v. Shalala*, 41 F.3d 661 (5th Cir. 1994). Here, the ALJ acknowledged that she reviewed all of the evidence. (Tr. 17); s*ee Daniels v. Apfel*, 181 F.3d 97 (5th Cir. May 20, 1999) (unpubl.) (ALJ's failure to discuss expert opinion testimony did not constitute error because he stated that he considered the entire record).

Plaintiff further argued that there was no evidence to support the ALJ's finding that she lived alone. However, LPC Corkern documented that Storm reported that she was living alone. (Tr. 380).

---

[5] *See also Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991) (recognizing that the regulations accord less weight to other sources such as chiropractors than to medical doctors).

[6] *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

While it certainly is possible that Storm's living situation had changed by the time of the hearing, *see* Tr. 34-35, there clearly was record evidence to support the ALJ's statement.

In sum, the court finds that the ALJ's RFC is supported by substantial evidence.

## IV.    Step Five

Aside from the challenges addressed above, plaintiff did not raise any error specific to the ALJ's step five determination.

## <u>Conclusion</u>

The Commissioner in this case was tasked with determining whether plaintiff was disabled.  In so doing, she considered the claimant's testimony, the medical record, and expert opinion evidence.  The evidence was by no means uniform and could have supported a different outcome.  Such conflicts in the evidence, however, are for the Commissioner to resolve.  *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted).  This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).  That is not to say that the Commissioner's decision is blemish-free, but procedural perfection in the administrative process is not required,[7] and any errors do not undermine confidence in the decision.

For the foregoing reasons, the undersigned finds that the Commissioner's determination that the claimant is not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error.  Accordingly,

---

[7] *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988).

21

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 9th day of July, 2019.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

22